

A. BLAIR DUNN, ESQ.*                    JARED R. VANDER DUSSEN, ESQ.**

# WARBA, LLP

## WESTERN AGRICULTURE, RESOURCE AND BUSINESS ADVOCATES, LLP

400 GOLD AVE SW, SUITE 1000
ALBUQUERQUE, NM 87102
T: (505) 750-3060 F: (505) 226-8500

LICENSED IN CO, NM AND SD*                    LICENSED IN NM**

July 21, 2021

**VIA CM/ECF**

Christopher M. Wolpert
Clerk of the Tenth Circuit Court of Appeals
The Byron White U.S. Courthouse
1823 Stout Street
Denver, CO 80257

*Re:*    *Thornton, et al v. Tyson Foods, et al*, Case No. 20-2124

Dear Mr. Wolpert,

I am writing on behalf of Appellants to advise the Court under Rule 28(j) of Executive Order 14036 from President Joseph R. Biden. Executive Order 14036, titled "Promoting Competition in the American Economy," found in the Federal Register at page 36987, Vol. 86, No. 132, and attached hereto for the Court's convenience directly supports the contentions of Appellants that the Appellees here are engaged in using voluntary deceptive practices to mislead consumers as well as exert anticompetitive pressures on the markets that American farmers and ranchers rely on for the sale of their cattle. Specifically, President Biden's Executive Order recognizes that the Congress' stated intent for the Federal Meat Inspection Act is to insure labels on meat are accurate and transparent regarding the origin of meat are not being met by stating that Secretary of Agriculture shall:

> (ii) to ensure consumers have accurate, transparent labels that enable them to choose products made in the United States, consider initiating a rulemaking to define the conditions under which the labeling of meat products can bear voluntary statements indicating that the product is of United States origin, such as "Product of USA";

*Id.* at 36993.

Thus, the Executive Order acknowledges that the voluntary statement of the Packers at issue in this litigation are knowingly deceiving consumers that foreign originating beef originates in the United States and is not properly subject to preemption as argued by the Appellees but rather violates the common law duty not to deceive and uses that collusively obtained and utilized deception to unfairly harm America's farmers' and ranchers' ability to compete in the market with the beef which they raise. And again, Appellants acknowledge that they are not requesting that the actual country of origin should be required under state law to be part of the label, they are requesting that the state law requirement for honesty that is also required by the federal act at issue should have been upheld by the district court instead of allowing fraudulent labeling to escape consequence. Furthermore, to emphasize the contentions that Appellants are making in this matter contrary to the characterizations of Appellees, it should be noted that mislabeling beef as being from this Country when it patently is not, is directly contrary to the touchstone of any preemption inquiry which begins with an examination of the Congress' stated intent. President Biden's Executive Order directly addresses resolving the deceptive labeling by these Appellees that is misleading consumers and hurting farmers and ranchers by depressing the prices that they receive for their cattle.

Respectfully submitted,

**WESTERN AGRICULTURE, RESOURCE
AND BUSINESS ADVOCATES, LLP**

*/s/ A. Blair Dunn*
A. Blair Dunn, Esq.
400 Gold Ave SW, Ste 1000
Albuquerque, NM 87102
Tel: (505) 750-3060
Fax: (505) 226-8500
ABDunn@ablairdunn-Esq.com

*Counsel for Plaintiff-Appellants*

cc:    All Counsel (via CM/ECF)

attachment: (1)

Federal Register

Vol. 86, No. 132

Wednesday, July 14, 2021

# Presidential Documents

Title 3—

**The President**

Executive Order 14036 of July 9, 2021

## Promoting Competition in the American Economy

By the authority vested in me as President by the Constitution and the laws of the United States of America, and in order to promote the interests of American workers, businesses, and consumers, it is hereby ordered as follows:

**Section 1**. *Policy.* A fair, open, and competitive marketplace has long been a cornerstone of the American economy, while excessive market concentration threatens basic economic liberties, democratic accountability, and the welfare of workers, farmers, small businesses, startups, and consumers.

The American promise of a broad and sustained prosperity depends on an open and competitive economy. For workers, a competitive marketplace creates more high-quality jobs and the economic freedom to switch jobs or negotiate a higher wage. For small businesses and farmers, it creates more choices among suppliers and major buyers, leading to more take-home income, which they can reinvest in their enterprises. For entrepreneurs, it provides space to experiment, innovate, and pursue the new ideas that have for centuries powered the American economy and improved our quality of life. And for consumers, it means more choices, better service, and lower prices.

Robust competition is critical to preserving America's role as the world's leading economy.

Yet over the last several decades, as industries have consolidated, competition has weakened in too many markets, denying Americans the benefits of an open economy and widening racial, income, and wealth inequality. Federal Government inaction has contributed to these problems, with workers, farmers, small businesses, and consumers paying the price.

Consolidation has increased the power of corporate employers, making it harder for workers to bargain for higher wages and better work conditions. Powerful companies require workers to sign non-compete agreements that restrict their ability to change jobs. And, while many occupational licenses are critical to increasing wages for workers and especially workers of color, some overly restrictive occupational licensing requirements can impede workers' ability to find jobs and to move between States.

Consolidation in the agricultural industry is making it too hard for small family farms to survive. Farmers are squeezed between concentrated market power in the agricultural input industries—seed, fertilizer, feed, and equipment suppliers—and concentrated market power in the channels for selling agricultural products. As a result, farmers' share of the value of their agricultural products has decreased, and poultry farmers, hog farmers, cattle ranchers, and other agricultural workers struggle to retain autonomy and to make sustainable returns.

The American information technology sector has long been an engine of innovation and growth, but today a small number of dominant internet platforms use their power to exclude market entrants, to extract monopoly profits, and to gather intimate personal information that they can exploit for their own advantage. Too many small businesses across the economy depend on those platforms and a few online marketplaces for their survival. And too many local newspapers have shuttered or downsized, in part due to the internet platforms' dominance in advertising markets.

Americans are paying too much for prescription drugs and healthcare services—far more than the prices paid in other countries. Hospital consolidation has left many areas, particularly rural communities, with inadequate or more expensive healthcare options. And too often, patent and other laws have been misused to inhibit or delay—for years and even decades—competition from generic drugs and biosimilars, denying Americans access to lower-cost drugs.

In the telecommunications sector, Americans likewise pay too much for broadband, cable television, and other communications services, in part because of a lack of adequate competition. In the financial-services sector, consumers pay steep and often hidden fees because of industry consolidation. Similarly, the global container shipping industry has consolidated into a small number of dominant foreign-owned lines and alliances, which can disadvantage American exporters.

The problem of economic consolidation now spans these sectors and many others, endangering our ability to rebuild and emerge from the coronavirus disease 2019 (COVID–19) pandemic with a vibrant, innovative, and growing economy. Meanwhile, the United States faces new challenges to its economic standing in the world, including unfair competitive pressures from foreign monopolies and firms that are state-owned or state-sponsored, or whose market power is directly supported by foreign governments.

We must act now to reverse these dangerous trends, which constrain the growth and dynamism of our economy, impair the creation of high-quality jobs, and threaten America's economic standing in the world.

This order affirms that it is the policy of my Administration to enforce the antitrust laws to combat the excessive concentration of industry, the abuses of market power, and the harmful effects of monopoly and monopsony—especially as these issues arise in labor markets, agricultural markets, Internet platform industries, healthcare markets (including insurance, hospital, and prescription drug markets), repair markets, and United States markets directly affected by foreign cartel activity.

It is also the policy of my Administration to enforce the antitrust laws to meet the challenges posed by new industries and technologies, including the rise of the dominant Internet platforms, especially as they stem from serial mergers, the acquisition of nascent competitors, the aggregation of data, unfair competition in attention markets, the surveillance of users, and the presence of network effects.

Whereas decades of industry consolidation have often led to excessive market concentration, this order reaffirms that the United States retains the authority to challenge transactions whose previous consummation was in violation of the Sherman Antitrust Act (26 Stat. 209, 15 U.S.C. 1 *et seq.*) (Sherman Act), the Clayton Antitrust Act (Public Law 63–212, 38 Stat. 730, 15 U.S.C. 12 *et seq.*) (Clayton Act), or other laws. *See* 15 U.S.C. 18; *Standard Oil Co. v. United States,* 221 U.S. 1 (1911).

This order reasserts as United States policy that the answer to the rising power of foreign monopolies and cartels is not the tolerance of domestic monopolization, but rather the promotion of competition and innovation by firms small and large, at home and worldwide.

It is also the policy of my Administration to support aggressive legislative reforms that would lower prescription drug prices, including by allowing Medicare to negotiate drug prices, by imposing inflation caps, and through other related reforms. It is further the policy of my Administration to support the enactment of a public health insurance option.

My Administration further reaffirms the policy stated in Executive Order 13725 of April 15, 2016 (Steps to Increase Competition and Better Inform Consumers and Workers to Support Continued Growth of the American Economy), and the Federal Government's commitment to the principles that led to the passage of the Sherman Act, the Clayton Act, the Packers and

Stockyards Act, 1921 (Public Law 67–51, 42 Stat. 159, 7 U.S.C. 181 *et seq.*) (Packers and Stockyards Act), the Celler-Kefauver Antimerger Act (Public Law 81–899, 64 Stat. 1125), the Bank Merger Act (Public Law 86–463, 74 Stat. 129, 12 U.S.C. 1828), and the Telecommunications Act of 1996 (Public Law 104–104, 110 Stat. 56), among others.

**Sec. 2**. *The Statutory Basis of a Whole-of-Government Competition Policy.* (a) The antitrust laws, including the Sherman Act, the Clayton Act, and the Federal Trade Commission Act (Public Law 63–203, 38 Stat. 717, 15 U.S.C. 41 *et seq.*), are a first line of defense against the monopolization of the American economy.

(b) The antitrust laws reflect an underlying policy favoring competition that transcends those particular enactments. As the Supreme Court has stated, for instance, the Sherman Act ''rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions.'' *Northern Pac. Ry. Co. v. United States,* 356 U.S. 1, 4 (1958).

(c) Consistent with these broader policies, and in addition to the traditional antitrust laws, the Congress has also enacted industry-specific fair competition and anti-monopolization laws that often provide additional protections. Such enactments include the Packers and Stockyards Act, the Federal Alcohol Administration Act (Public Law 74–401, 49 Stat. 977, 27 U.S.C. 201 *et seq.*), the Bank Merger Act, the Drug Price Competition and Patent Term Restoration Act of 1984 (Public Law 98–417, 98 Stat. 1585), the Shipping Act of 1984 (Public Law 98–237, 98 Stat. 67, 46 U.S.C. 40101 *et seq.*) (Shipping Act), the ICC Termination Act of 1995 (Public Law 104–88, 109 Stat. 803), the Telecommunications Act of 1996, the Fairness to Contact Lens Consumers Act (Public Law 108–164, 117 Stat. 2024, 15 U.S.C. 7601 *et seq.*), and the Dodd-Frank Wall Street Reform and Consumer Protection Act (Public Law 111–203, 124 Stat. 1376) (Dodd-Frank Act).

(d) These statutes independently charge a number of executive departments and agencies (agencies) to protect conditions of fair competition in one or more ways, including by:

(i) policing unfair, deceptive, and abusive business practices;

(ii) resisting consolidation and promoting competition within industries through the independent oversight of mergers, acquisitions, and joint ventures;

(iii) promulgating rules that promote competition, including the market entry of new competitors; and

(iv) promoting market transparency through compelled disclosure of information.

(e) The agencies that administer such or similar authorities include the Department of the Treasury, the Department of Agriculture, the Department of Health and Human Services, the Department of Transportation, the Federal Reserve System, the Federal Trade Commission (FTC), the Securities and Exchange Commission, the Federal Deposit Insurance Corporation, the Federal Communications Commission, the Federal Maritime Commission, the Commodity Futures Trading Commission, the Federal Energy Regulatory Commission, the Consumer Financial Protection Bureau, and the Surface Transportation Board.

(f) Agencies can influence the conditions of competition through their exercise of regulatory authority or through the procurement process. *See* 41 U.S.C. 1705.

(g) This order recognizes that a whole-of-government approach is necessary to address overconcentration, monopolization, and unfair competition in the American economy. Such an approach is supported by existing statutory mandates. Agencies can and should further the polices set forth in section

1 of this order by, among other things, adopting pro-competitive regulations and approaches to procurement and spending, and by rescinding regulations that create unnecessary barriers to entry that stifle competition.

**Sec. 3**. *Agency Cooperation in Oversight, Investigation, and Remedies.* (a) The Congress frequently has created overlapping agency jurisdiction in the policing of anticompetitive conduct and the oversight of mergers. It is the policy of my Administration that, when agencies have overlapping jurisdiction, they should endeavor to cooperate fully in the exercise of their oversight authority, to benefit from the respective expertise of the agencies and to improve Government efficiency.

(b) Where there is overlapping jurisdiction over particular cases, conduct, transactions, or industries, agencies are encouraged to coordinate their efforts, as appropriate and consistent with applicable law, with respect to:

(i) the investigation of conduct potentially harmful to competition;

(ii) the oversight of proposed mergers, acquisitions, and joint ventures; and

(iii) the design, execution, and oversight of remedies.

(c) The means of cooperation in cases of overlapping jurisdiction should include, as appropriate and consistent with applicable law:

(i) sharing relevant information and industry data;

(ii) in the case of major transactions, soliciting and giving significant consideration to the views of the Attorney General or the Chair of the FTC, as applicable; and

(iii) cooperating with any concurrent Department of Justice or FTC oversight activities under the Sherman Act or Clayton Act.

(d) Nothing in subsections (a) through (c) of this section shall be construed to suggest that the statutory standard applied by an agency, or its independent assessment under that standard, should be displaced or substituted by the judgment of the Attorney General or the Chair of the FTC. When their views are solicited, the Attorney General and the Chair of the FTC are encouraged to provide a response to the agency in time for the agency to consider it in advance of any statutory deadline for agency action.

**Sec. 4**. *The White House Competition Council.* (a) There is established a White House Competition Council (Council) within the Executive Office of the President.

(b) The Council shall coordinate, promote, and advance Federal Government efforts to address overconcentration, monopolization, and unfair competition in or directly affecting the American economy, including efforts to:

(i) implement the administrative actions identified in this order;

(ii) develop procedures and best practices for agency cooperation and coordination on matters of overlapping jurisdiction, as described in section 3 of this order;

(iii) identify and advance any additional administrative actions necessary to further the policies set forth in section 1 of this order; and

(iv) identify any potential legislative changes necessary to further the policies set forth in section 1 of this order.

(c) The Council shall work across agencies to provide a coordinated response to overconcentration, monopolization, and unfair competition in or directly affecting the American economy. The Council shall also work with each agency to ensure that agency operations are conducted in a manner that promotes fair competition, as appropriate and consistent with applicable law.

(d) The Council shall not discuss any current or anticipated enforcement actions.

(e) The Council shall be led by the Assistant to the President for Economic Policy and Director of the National Economic Council, who shall serve as Chair of the Council.

(f) In addition to the Chair, the Council shall consist of the following members:

(i) the Secretary of the Treasury;

(ii) the Secretary of Defense;

(iii) the Attorney General;

(iv) the Secretary of Agriculture;

(v) the Secretary of Commerce;

(vi) the Secretary of Labor;

(vii) the Secretary of Health and Human Services;

(viii) the Secretary of Transportation;

(ix) the Administrator of the Office of Information and Regulatory Affairs; and

(x) the heads of such other agencies and offices as the Chair may from time to time invite to participate.

(g) The Chair shall invite the participation of the Chair of the FTC, the Chair of the Federal Communications Commission, the Chair of the Federal Maritime Commission, the Director of the Consumer Financial Protection Bureau, and the Chair of the Surface Transportation Board, to the extent consistent with their respective statutory authorities and obligations.

(h) Members of the Council shall designate, not later than 30 days after the date of this order, a senior official within their respective agency or office who shall coordinate with the Council and who shall be responsible for overseeing the agency's or office's efforts to address overconcentration, monopolization, and unfair competition. The Chair may coordinate subgroups consisting exclusively of Council members or their designees, as appropriate.

(i) The Council shall meet on a semi-annual basis unless the Chair determines that a meeting is unnecessary.

(j) Each agency shall bear its own expenses for participating in the Council.

**Sec. 5.** *Further Agency Responsibilities.* (a) The heads of all agencies shall consider using their authorities to further the policies set forth in section 1 of this order, with particular attention to:

(i) the influence of any of their respective regulations, particularly any licensing regulations, on concentration and competition in the industries under their jurisdiction; and

(ii) the potential for their procurement or other spending to improve the competitiveness of small businesses and businesses with fair labor practices.

(b) The Attorney General, the Chair of the FTC, and the heads of other agencies with authority to enforce the Clayton Act are encouraged to enforce the antitrust laws fairly and vigorously.

(c) To address the consolidation of industry in many markets across the economy, as described in section 1 of this order, the Attorney General and the Chair of the FTC are encouraged to review the horizontal and vertical merger guidelines and consider whether to revise those guidelines.

(d) To avoid the potential for anticompetitive extension of market power beyond the scope of granted patents, and to protect standard-setting processes from abuse, the Attorney General and the Secretary of Commerce are encouraged to consider whether to revise their position on the intersection of the intellectual property and antitrust laws, including by considering whether to revise the Policy Statement on Remedies for Standards-Essential Patents Subject to Voluntary F/RAND Commitments issued jointly by the Department

of Justice, the United States Patent and Trademark Office, and the National Institute of Standards and Technology on December 19, 2019.

(e) To ensure Americans have choices among financial institutions and to guard against excessive market power, the Attorney General, in consultation with the Chairman of the Board of Governors of the Federal Reserve System, the Chairperson of the Board of Directors of the Federal Deposit Insurance Corporation, and the Comptroller of the Currency, is encouraged to review current practices and adopt a plan, not later than 180 days after the date of this order, for the revitalization of merger oversight under the Bank Merger Act and the Bank Holding Company Act of 1956 (Public Law 84–511, 70 Stat. 133, 12 U.S.C. 1841 *et seq.*) that is in accordance with the factors enumerated in 12 U.S.C. 1828(c) and 1842(c).

(f) To better protect workers from wage collusion, the Attorney General and the Chair of the FTC are encouraged to consider whether to revise the Antitrust Guidance for Human Resource Professionals of October 2016.

(g) To address agreements that may unduly limit workers' ability to change jobs, the Chair of the FTC is encouraged to consider working with the rest of the Commission to exercise the FTC's statutory rulemaking authority under the Federal Trade Commission Act to curtail the unfair use of non-compete clauses and other clauses or agreements that may unfairly limit worker mobility.

(h) To address persistent and recurrent practices that inhibit competition, the Chair of the FTC, in the Chair's discretion, is also encouraged to consider working with the rest of the Commission to exercise the FTC's statutory rulemaking authority, as appropriate and consistent with applicable law, in areas such as:

(i) unfair data collection and surveillance practices that may damage competition, consumer autonomy, and consumer privacy;

(ii) unfair anticompetitive restrictions on third-party repair or self-repair of items, such as the restrictions imposed by powerful manufacturers that prevent farmers from repairing their own equipment;

(iii) unfair anticompetitive conduct or agreements in the prescription drug industries, such as agreements to delay the market entry of generic drugs or biosimilars;

(iv) unfair competition in major Internet marketplaces;

(v) unfair occupational licensing restrictions;

(vi) unfair tying practices or exclusionary practices in the brokerage or listing of real estate; and

(vii) any other unfair industry-specific practices that substantially inhibit competition.

(i) The Secretary of Agriculture shall:

(i) to address the unfair treatment of farmers and improve conditions of competition in the markets for their products, consider initiating a rulemaking or rulemakings under the Packers and Stockyards Act to strengthen the Department of Agriculture's regulations concerning unfair, unjustly discriminatory, or deceptive practices and undue or unreasonable preferences, advantages, prejudices, or disadvantages, with the purpose of furthering the vigorous implementation of the law established by the Congress in 1921 and fortified by amendments. In such rulemaking or rulemakings, the Secretary of Agriculture shall consider, among other things:

(A) providing clear rules that identify recurrent practices in the livestock, meat, and poultry industries that are unfair, unjustly discriminatory, or deceptive and therefore violate the Packers and Stockyards Act;

(B) reinforcing the long-standing Department of Agriculture interpretation that it is unnecessary under the Packers and Stockyards Act to demonstrate

industry-wide harm to establish a violation of the Act and that the "unfair, unjustly discriminatory, or deceptive" treatment of one farmer, the giving to one farmer of an "undue or unreasonable preference or advantage," or the subjection of one farmer to an "undue or unreasonable prejudice or disadvantage in any respect" violates the Act;

(C) prohibiting unfair practices related to grower ranking systems—systems in which the poultry companies, contractors, or dealers exercise extraordinary control over numerous inputs that determine the amount farmers are paid and require farmers to assume the risk of factors outside their control, leaving them more economically vulnerable;

(D) updating the appropriate definitions or set of criteria, or application thereof, for undue or unreasonable preferences, advantages, prejudices, or disadvantages under the Packers and Stockyards Act; and

(E) adopting, to the greatest extent possible and as appropriate and consistent with applicable law, appropriate anti-retaliation protections, so that farmers may assert their rights without fear of retribution;

(ii) to ensure consumers have accurate, transparent labels that enable them to choose products made in the United States, consider initiating a rulemaking to define the conditions under which the labeling of meat products can bear voluntary statements indicating that the product is of United States origin, such as "Product of USA";

(iii) to ensure that farmers have greater opportunities to access markets and receive a fair return for their products, not later than 180 days after the date of this order, submit a report to the Chair of the White House Competition Council, with a plan to promote competition in the agricultural industries and to support value-added agriculture and alternative food distribution systems through such means as:

(A) the creation or expansion of useful information for farmers, such as model contracts, to lower transaction costs and help farmers negotiate fair deals;

(B) measures to encourage improvements in transparency and standards so that consumers may choose to purchase products that support fair treatment of farmers and agricultural workers and sustainable agricultural practices;

(C) measures to enhance price discovery, increase transparency, and improve the functioning of the cattle and other livestock markets;

(D) enhanced tools, including any new legislative authorities needed, to protect whistleblowers, monitor agricultural markets, and enforce relevant laws;

(E) any investments or other support that could bolster competition within highly concentrated agricultural markets; and

(F) any other means that the Secretary of Agriculture deems appropriate;

(iv) to improve farmers' and smaller food processors' access to retail markets, not later than 300 days after the date of this order, in consultation with the Chair of the FTC, submit a report to the Chair of the White House Competition Council, on the effect of retail concentration and retailers' practices on the conditions of competition in the food industries, including any practices that may violate the Federal Trade Commission Act, the Robinson-Patman Act (Public Law 74–692, 49 Stat. 1526, 15 U.S.C. 13 *et seq.*), or other relevant laws, and on grants, loans, and other support that may enhance access to retail markets by local and regional food enterprises; and

(v) to help ensure that the intellectual property system, while incentivizing innovation, does not also unnecessarily reduce competition in seed and other input markets beyond that reasonably contemplated by the Patent Act (*see* 35 U.S.C. 100 *et seq.* and 7 U.S.C. 2321 *et seq.*), in consultation

with the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office, submit a report to the Chair of the White House Competition Council, enumerating and describing any relevant concerns of the Department of Agriculture and strategies for addressing those concerns across intellectual property, antitrust, and other relevant laws.

(j) To protect the vibrancy of the American markets for beer, wine, and spirits, and to improve market access for smaller, independent, and new operations, the Secretary of the Treasury, in consultation with the Attorney General and the Chair of the FTC, not later than 120 days after the date of this order, shall submit a report to the Chair of the White House Competition Council, assessing the current market structure and conditions of competition, including an assessment of any threats to competition and barriers to new entrants, including:

(i) any unlawful trade practices in the beer, wine, and spirits markets, such as certain exclusionary, discriminatory, or anticompetitive distribution practices, that hinder smaller and independent businesses or new entrants from distributing their products;

(ii) patterns of consolidation in production, distribution, or retail beer, wine, and spirits markets; and

(iii) any unnecessary trade practice regulations of matters such as bottle sizes, permitting, or labeling that may unnecessarily inhibit competition by increasing costs without serving any public health, informational, or tax purpose.

(k) To follow up on the foregoing assessment, the Secretary of the Treasury, through the Administrator of the Alcohol and Tobacco Tax and Trade Bureau, shall, not later than 240 days after the date of this order, consider:

(i) initiating a rulemaking to update the Alcohol and Tobacco Tax and Trade Bureau's trade practice regulations;

(ii) rescinding or revising any regulations of the beer, wine, and spirits industries that may unnecessarily inhibit competition; and

(iii) reducing any barriers that impede market access for smaller and independent brewers, winemakers, and distilleries.

(l) To promote competition, lower prices, and a vibrant and innovative telecommunications ecosystem, the Chair of the Federal Communications Commission is encouraged to work with the rest of the Commission, as appropriate and consistent with applicable law, to consider:

(i) adopting through appropriate rulemaking "Net Neutrality" rules similar to those previously adopted under title II of the Communications Act of 1934 (Public Law 73–416, 48 Stat. 1064, 47 U.S.C. 151 *et seq.*), as amended by the Telecommunications Act of 1996, in "Protecting and Promoting the Open internet," 80 Fed.Reg. 19738 (Apr. 13, 2015);

(ii) conducting future spectrum auctions under rules that are designed to help avoid excessive concentration of spectrum license holdings in the United States, so as to prevent spectrum stockpiling, warehousing of spectrum by licensees, or the creation of barriers to entry, and to improve the conditions of competition in industries that depend upon radio spectrum, including mobile communications and radio-based broadband services;

(iii) providing support for the continued development and adoption of 5G Open Radio Access Network (O-RAN) protocols and software, continuing to attend meetings of voluntary and consensus-based standards development organizations, so as to promote or encourage a fair and representative standard-setting process, and undertaking any other measures that might promote increased openness, innovation, and competition in the markets for 5G equipment;

(iv) prohibiting unjust or unreasonable early termination fees for end-user communications contracts, enabling consumers to more easily switch providers;

(v) initiating a rulemaking that requires broadband service providers to display a broadband consumer label, such as that as described in the Public Notice of the Commission issued on April 4, 2016 (DA 16–357), so as to give consumers clear, concise, and accurate information regarding provider prices and fees, performance, and network practices;

(vi) initiating a rulemaking to require broadband service providers to regularly report broadband price and subscription rates to the Federal Communications Commission for the purpose of disseminating that information to the public in a useful manner, to improve price transparency and market functioning; and

(vii) initiating a rulemaking to prevent landlords and cable and Internet service providers from inhibiting tenants' choices among providers.

(m) The Secretary of Transportation shall:

(i) to better protect consumers and improve competition, and as appropriate and consistent with applicable law:

(A) not later than 30 days after the date of this order, appoint or reappoint members of the Advisory Committee for Aviation Consumer Protection to ensure fair representation of consumers, State and local interests, airlines, and airports with respect to the evaluation of aviation consumer protection programs and convene a meeting of the Committee as soon as practicable;

(B) promote enhanced transparency and consumer safeguards, as appropriate and consistent with applicable law, including through potential rulemaking, enforcement actions, or guidance documents, with the aims of:

(1) enhancing consumer access to airline flight information so that consumers can more easily find a broader set of available flights, including by new or lesser known airlines; and

(2) ensuring that consumers are not exposed or subject to advertising, marketing, pricing, and charging of ancillary fees that may constitute an unfair or deceptive practice or an unfair method of competition;

(C) not later than 45 days after the date of this order, submit a report to the Chair of the White House Competition Council, on the progress of the Department of Transportation's investigatory and enforcement activities to address the failure of airlines to provide timely refunds for flights cancelled as a result of the COVID–19 pandemic;

(D) not later than 45 days after the date of this order, publish for notice and comment a proposed rule requiring airlines to refund baggage fees when a passenger's luggage is substantially delayed and other ancillary fees when passengers pay for a service that is not provided;

(E) not later than 60 days after the date of this order, start development of proposed amendments to the Department of Transportation's definitions of ''unfair'' and ''deceptive'' in 49 U.S.C. 41712; and

(F) not later than 90 days after the date of this order, consider initiating a rulemaking to ensure that consumers have ancillary fee information, including ''baggage fees,'' ''change fees,'' and ''cancellation fees,'' at the time of ticket purchase;

(ii) to provide consumers with more flight options at better prices and with improved service, and to extend opportunities for competition and market entry as the industry evolves:

(A) not later than 30 days after the date of this order, convene a working group within the Department of Transportation to evaluate the effectiveness of existing commercial aviation programs, consumer protections, and rules of the Federal Aviation Administration;

(B) consult with the Attorney General regarding means of enhancing effective coordination between the Department of Justice and the Department of Transportation to ensure competition in air transportation and the ability of new entrants to gain access; and

(C) consider measures to support airport development and increased capacity and improve airport congestion management, gate access, implementation of airport competition plans pursuant to 49 U.S.C. 47106(f), and "slot" administration;

(iii) given the emergence of new aerospace-based transportation technologies, such as low-altitude unmanned aircraft system deliveries, advanced air mobility, and high-altitude long endurance operations, that have great potential for American travelers and consumers, yet also the danger of early monopolization or new air traffic control problems, ensure that the Department of Transportation takes action with respect to these technologies to:

(A) facilitate innovation that fosters United States market leadership and market entry to promote competition and economic opportunity and to resist monopolization, while also ensuring safety, providing security and privacy, protecting the environment, and promoting equity; and

(B) provide vigilant oversight over market participants.

(n) To further competition in the rail industry and to provide accessible remedies for shippers, the Chair of the Surface Transportation Board (Chair) is encouraged to work with the rest of the Board to:

(i) consider commencing or continuing a rulemaking to strengthen regulations pertaining to reciprocal switching agreements pursuant to 49 U.S.C. 11102(c), if the Chair determines such rulemaking to be in the public interest or necessary to provide competitive rail service;

(ii) consider rulemakings pertaining to any other relevant matter of competitive access, including bottleneck rates, interchange commitments, or other matters, consistent with the policies set forth in section 1 of this order;

(iii) to ensure that passenger rail service is not subject to unwarranted delays and interruptions in service due to host railroads' failure to comply with the required preference for passenger rail, vigorously enforce new on-time performance requirements adopted pursuant to the Passenger Rail Investment and Improvement Act of 2008 (Public Law 110–423, 122 Stat. 4907) that will take effect on July 1, 2021, and further the work of the passenger rail working group formed to ensure that the Surface Transportation Board will fully meet its obligations; and

(iv) in the process of determining whether a merger, acquisition, or other transaction involving rail carriers is consistent with the public interest under 49 U.S.C. 11323–25, consider a carrier's fulfillment of its responsibilities under 49 U.S.C. 24308 (relating to Amtrak's statutory rights).

(o) The Chair of the Federal Maritime Commission is encouraged to work with the rest of the Commission to:

(i) vigorously enforce the prohibition of unjust and unreasonable practices in the context of detention and demurrage pursuant to the Shipping Act, as clarified in "Interpretive Rule on Demurrage and Detention Under the Shipping Act," 85 Fef. Reg. 29638 (May 18, 2020);

(ii) request from the National Shipper Advisory Committee recommendations for improving detention and demurrage practices and enforcement of related Shipping Act prohibitions; and

(iii) consider further rulemaking to improve detention and demurrage practices and enforcement of related Shipping Act prohibitions.

(p) The Secretary of Health and Human Services shall:

(i) to promote the wide availability of low-cost hearing aids, not later than 120 days after the date of this order, publish for notice and comment a proposed rule on over-the-counter hearing-aids, as called for by section 709 of the FDA Reauthorization Act of 2017 (Public Law 115–52, 131 Stat. 1005);

(ii) support existing price transparency initiatives for hospitals, other providers, and insurers along with any new price transparency initiatives

or changes made necessary by the No Surprises Act (Public Law 116–260, 134 Stat. 2758) or any other statutes;

(iii) to ensure that Americans can choose health insurance plans that meet their needs and compare plan offerings, implement standardized options in the national Health Insurance Marketplace and any other appropriate mechanisms to improve competition and consumer choice;

(iv) not later than 45 days after the date of this order, submit a report to the Assistant to the President for Domestic Policy and Director of the Domestic Policy Council and to the Chair of the White House Competition Council, with a plan to continue the effort to combat excessive pricing of prescription drugs and enhance domestic pharmaceutical supply chains, to reduce the prices paid by the Federal Government for such drugs, and to address the recurrent problem of price gouging;

(v) to lower the prices of and improve access to prescription drugs and biologics, continue to promote generic drug and biosimilar competition, as contemplated by the Drug Competition Action Plan of 2017 and Biosimilar Action Plan of 2018 of the Food and Drug Administration (FDA), including by:

(A) continuing to clarify and improve the approval framework for generic drugs and biosimilars to make generic drug and biosimilar approval more transparent, efficient, and predictable, including improving and clarifying the standards for interchangeability of biological products;

(B) as authorized by the Advancing Education on Biosimilars Act of 2021 (Public Law 117–8, 135 Stat. 254, 42 U.S.C. 263–1), supporting biosimilar product adoption by providing effective educational materials and communications to improve understanding of biosimilar and interchangeable products among healthcare providers, patients, and caregivers;

(C) to facilitate the development and approval of biosimilar and interchangeable products, continuing to update the FDA's biologics regulations to clarify existing requirements and procedures related to the review and submission of Biologics License Applications by advancing the ''Biologics Regulation Modernization'' rulemaking (RIN 0910–AI14); and

(D) with the Chair of the FTC, identifying and addressing any efforts to impede generic drug and biosimilar competition, including but not limited to false, misleading, or otherwise deceptive statements about generic drug and biosimilar products and their safety or effectiveness;

(vi) to help ensure that the patent system, while incentivizing innovation, does not also unjustifiably delay generic drug and biosimilar competition beyond that reasonably contemplated by applicable law, not later than 45 days after the date of this order, through the Commissioner of Food and Drugs, write a letter to the Under Secretary of Commerce for Intellectual Property and Director of the United States Patent and Trademark Office enumerating and describing any relevant concerns of the FDA;

(vii) to support the market entry of lower-cost generic drugs and biosimilars, continue the implementation of the law widely known as the CREATES Act of 2019 (Public Law 116–94, 133 Stat. 3130), by:

(A) promptly issuing Covered Product Authorizations (CPAs) to assist product developers with obtaining brand-drug samples; and

(B) issuing guidance to provide additional information for industry about CPAs; and

(viii) through the Administrator of the Centers for Medicare and Medicaid Services, prepare for Medicare and Medicaid coverage of interchangeable biological products, and for payment models to support increased utilization of generic drugs and biosimilars.

(q) To reduce the cost of covered products to the American consumer without imposing additional risk to public health and safety, the Commissioner of Food and Drugs shall work with States and Indian Tribes that

propose to develop section 804 Importation Programs in accordance with the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (Public Law 108–173, 117 Stat. 2066), and the FDA's implementing regulations.

(r) The Secretary of Commerce shall:

(i) acting through the Director of the National Institute of Standards and Technology (NIST), consider initiating a rulemaking to require agencies to report to NIST, on an annual basis, their contractors' utilization activities, as reported to the agencies under 35 U.S.C. 202(c)(5);

(ii) acting through the Director of NIST, consistent with the policies set forth in section 1 of this order, consider not finalizing any provisions on march-in rights and product pricing in the proposed rule "Rights to Federally Funded Inventions and Licensing of Government Owned Inventions," 86 Fed. Reg. 35 (Jan. 4, 2021); and

(iii) not later than 1 year after the date of this order, in consultation with the Attorney General and the Chair of the Federal Trade Commission, conduct a study, including by conducting an open and transparent stakeholder consultation process, of the mobile application ecosystem, and submit a report to the Chair of the White House Competition Council, regarding findings and recommendations for improving competition, reducing barriers to entry, and maximizing user benefit with respect to the ecosystem.

(s) The Secretary of Defense shall:

(i) ensure that the Department of Defense's assessment of the economic forces and structures shaping the capacity of the national security innovation base pursuant to section 889(a) and (b) of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021 (Public Law 116–283, 134 Stat. 3388) is consistent with the policy set forth in section 1 of this order;

(ii) not later than 180 days after the date of this order, submit to the Chair of the White House Competition Council, a review of the state of competition within the defense industrial base, including areas where a lack of competition may be of concern and any recommendations for improving the solicitation process, consistent with the goal of the Competition in Contracting Act of 1984 (Public Law 98–369, 98 Stat. 1175); and

(iii) not later than 180 days after the date of this order, submit a report to the Chair of the White House Competition Council, on a plan for avoiding contract terms in procurement agreements that make it challenging or impossible for the Department of Defense or service members to repair their own equipment, particularly in the field.

(t) The Director of the Consumer Financial Protection Bureau, consistent with the pro-competition objectives stated in section 1021 of the Dodd-Frank Act, is encouraged to consider:

(i) commencing or continuing a rulemaking under section 1033 of the Dodd-Frank Act to facilitate the portability of consumer financial transaction data so consumers can more easily switch financial institutions and use new, innovative financial products; and

(ii) enforcing the prohibition on unfair, deceptive, or abusive acts or practices in consumer financial products or services pursuant to section 1031 of the Dodd-Frank Act so as to ensure that actors engaged in unlawful activities do not distort the proper functioning of the competitive process or obtain an unfair advantage over competitors who follow the law.

(u) The Director of the Office of Management and Budget, through the Administrator of the Office of Information and Regulatory Affairs, shall incorporate into its recommendations for modernizing and improving regulatory review required by my Memorandum of January 20, 2021 (Modernizing Regulatory Review), the policies set forth in section 1 of this order, including consideration of whether the effects on competition and the potential for creation of barriers to entry should be included in regulatory impact analyses.

(v) The Secretary of the Treasury shall:

(i) direct the Office of Economic Policy, in consultation with the Attorney General, the Secretary of Labor, and the Chair of the FTC, to submit a report to the Chair of the White House Competition Council, not later than 180 days after the date of this order, on the effects of lack of competition on labor markets; and

(ii) submit a report to the Chair of the White House Competition Council, not later than 270 days after the date of this order, assessing the effects on competition of large technology firms' and other non-bank companies' entry into consumer finance markets.

**Sec. 6**. *General Provisions.* (a) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(b) Where not already specified, independent agencies are encouraged to comply with the requirements of this order.

(c) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(d) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*July 9, 2021.*

[FR Doc. 2021–15069
Filed 7–13–21; 8:45 am]
Billing code 3295–F1–P